1

2

3

4

5

6

7

8                      UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   LORENZO CASTENEDA,                        No.  2:21-cv-2196 DAD CSK P

12                   Plaintiff,

13         v.                                   ORDER AND

14   J. QUIRING, et al.,                        FINDINGS & RECOMMENDATIONS

15                   Defendants.

16

17         Plaintiff is a state prisoner proceeding pro se and in forma pauperis with a civil rights

18   complaint under 42 U.S.C. § 1983.  Defendants' fully briefed motions for summary judgment and

19   to strike plaintiff's sur-reply are before the Court.  (ECF Nos. 66, 78.)  As discussed below, the

20   Court grants defendants' motion to strike, and recommends that the motion for summary

21   judgment be granted in part and denied in part.

22   I.    BACKGROUND

23         In his original complaint, plaintiff raised excessive force and retaliation claims against

24   defendants Lt. J. Quiring, Sgt. K. McTaggart, Officer Rowe, and Officer Medina ("custody

25   defendants"), all employed at Mule Creek State Prison ("MCSP").  (ECF No. 1.)  On February

26   16, 2022, the Court ordered service on the custody defendants.  (ECF No. 13.)  On July 26, 2022,

27   defendants J. Quiring, K. McTaggart, J. Rowe and S. Medina filed an answer.  (ECF No. 24.)

28         On November 15, 2022, plaintiff filed a motion to amend to add as defendants K.

                                            1

Chamberlin and M. Arteaga, who plaintiff identified through discovery and had named as Doe defendants in the original complaint. (ECF No. 35 at 3.) On December 30, 2022, the Court granted plaintiff leave to amend and screened the first amended complaint, finding that plaintiff's allegations as to defendants K. Chamberlin and M. Arteaga were vague and conclusory; the claims were dismissed, and plaintiff was again granted leave to amend. (Id. at 7-8, 9.) On January 30, 2023, plaintiff filed the second amended complaint. (ECF No. 36.) On February 1, 2023, the second amended complaint was screened, which was served on defendants K. Chamberlin and M. Arteaga, and on April 29, 2023, all six defendants filed an answer to the second amended complaint (ECF No. 49).

Plaintiff was first deposed on September 27, 2022. Pl.'s Dep. I. After plaintiff was allowed to amend again and filed the SAC, plaintiff was deposed a second time, on October 16, 2023. Pl.'s Dep. II.

On March 1, 2024, all defendants filed a motion for summary judgment. (ECF No. 66.) On March 29, 2024, plaintiff filed an opposition. (ECF No. 73.) On May 22, 2024, defendants filed a reply. (ECF No. 76.) On June 14, 2024, plaintiff filed a sur-reply without leave of court. (ECF No. 77.) On June 24, 2024, defendants filed a motion to strike the sur-reply. (ECF No. 78.) On July 3, 2024, plaintiff filed an opposition to defendants' motion to strike the sur-reply. (ECF No. 79.)

## II.    SECOND AMENDED COMPLAINT

In his verified second amended complaint ("SAC"), plaintiff alleges that while he was under the EOP[1] level of mental health care at MCSP, the following took place:

On April 1, 2021, defendants Sgt. K. McTaggart and Lt. J. Quiring ordered defendant J. Rowe to cuff up plaintiff behind his back and put him in a small stand up cage with no seat and no room to move around. SAC at 5 (ECF No. 36). Defendant Rowe applied the handcuffs

---

[1] The Mental Health Services Delivery System Program Guide for the California Department of Corrections and Rehabilitation provides four levels of mental health care services: Correctional Clinical Case Management System ("CCCMS"); Enhanced Outpatient ("EOP"); Mental Health Crisis Bed ("MHCB") and inpatient hospital care. Coleman v. Brown, 2013 WL 6491529, at *1 (E.D. Cal. Dec. 10, 2013).

1   extremely tight.  Id.  "Plaintiff pleaded with defendant to please loose[n] the handcuffs[;]

2   defendant Rowe stated stop complaining I am only following orders from my sergeant [and]

3   lieutenant."  Id.  Plaintiff remained in the holding cage for four hours with no restroom breaks or

4   drinking water, with his hands tightly cuffed behind his back.  Id.

5          On April 2, 2021, defendants Sgt. K. McTaggart and Lt. J. Quiring ordered defendant

6   Officer Medina to cuff up plaintiff behind his back and put him in the stand up cage.  Id.  The

7   handcuffs were again applied extremely tight.  Id.  Plaintiff pleaded with Medina to loosen the

8   handcuffs, but "Medina stated don't tell me[,] talk to the sergeant; this is above my pay rate."  Id.

9   Plaintiff remained in the cage for the next four hours, hands cuffed behind his back, with no

10  restroom breaks or drinking water.  Id. at 6.

11         On both days, plaintiff pleaded with Sgt. McTaggart and Lt. Quiring, telling them the

12  handcuffs were intentionally tightened by Officers Rowe and Medina and were causing plaintiff

13  severe pain, that he had had back surgery and suffered chronic pain to his wrist, knees and back.

14  Id.  Plaintiff also told them that he needed to use the restroom and requested drinking water.  Id.

15  "Defendant K. McTaggart responded 602 us like you always do.  Defendant J. Quiring stated you

16  heard[,] 602 us."  Id. at 5-6.  The defendants then laughed, mocked plaintiff, and ignored his pleas

17  for help.  Id.  As a result of the custody defendants' actions, plaintiff urinated on himself while

18  handcuffed in the cage.  Id. at 7.

19         Plaintiff sought medical care from defendants Chamberlin and Arteaga, both Licensed

20  Vocational Nurses ("LVNs"), notifying them plaintiff was in pain, and requesting assistance for

21  plaintiff's pain and injuries.  Id. at 6.  Plaintiff requested that both defendants Chamberlin and

22  Arteaga document plaintiff's pain and injuries on a 7219 medical form, but they refused;

23  defendant Arteaga told plaintiff "no, no, no, I am not going to report anything."  Id.  Plaintiff's

24  injuries included bruises, swollen wrists, and pain to his back, shoulders, knees, neck and feet.  Id.

25  at 6-7.

26         Plaintiff argues that the custody defendants subjected plaintiff to excessive force and

27  unreasonable use of mechanical restraints with the specific intent to punish and inflict pain on

28  plaintiff.  Id. at 8.  He contends the restraints were used maliciously and sadistically for the very

1    purpose of causing plaintiff harm.  Id.  Plaintiff alleges that the custody defendants' refusal to

2    provide water or restroom access over the eight hours he was held in the holding cell (four hours

3    on each day) demonstrate conditions violating plaintiff's right to humane conditions of

4    confinement.  Id. at 9.  Plaintiff alleges defendants McTaggart and Quiring were aware of the

5    mistreatment by defendants Rowe and Medina yet failed to intervene and knowingly allowed it to

6    continue.  Id.

7        Liberally construed, plaintiff also alleges defendants Rowe, Medina, McTaggart and

8    Quiring retaliated against plaintiff by handcuffing him and placing him in the holding cells

9    because plaintiff filed 602 grievances.  Id. at 8.  On information and belief, plaintiff claims the

10   custody defendants have a "significant history of misconduct" toward prisoners at MCSP,

11   including excessive force, falsifying reports, and retaliation against prisoners who file 602

12   grievances.  Id.

13       Further, plaintiff contends defendants Chamberlin and Arteaga subjected plaintiff "to

14   deliberate indifference to plaintiff['s] need for medical care."  Id. at 7.  On information and belief,

15   plaintiff claims defendants Chamberlin and Arteaga have a significant history of falsifying

16   medical records.  Id. at 8.  Plaintiff argues defendants Chamberlin and Arteaga had a duty to

17   ensure plaintiff was provided adequate medical care and personal safety and their refusal violated

18   his Eighth Amendment rights.  Id. at 7.

19       In addition, plaintiff alleges that "[d]efendants[,] acting in concert with each other[,]

20   reached an understanding to conspire by falsifying reports[,] holding cell logs dated April 1 and 2,

21   2021, documenting regular checks by staff and restroom breaks and by refusing to document

22   plaintiff's injuries on an injury report form."  Id. at 7.  Specifically, plaintiff alleges that

23   defendants Rowe and Medina joined a conspiracy when they followed orders by McTaggart and

24   Quiring to maliciously and sadistically apply handcuffs to plaintiff and by refusing to provide

25   water and restroom breaks.  Id. at 14.  Plaintiff contends defendants McTaggart and Quiring

26   joined the conspiracy when they ordered defendants Rowe and Medina to maliciously and

27   sadistically restrain plaintiff and by refusing to provide water and restroom breaks.  Id. at 15.  In

28   support, plaintiff claims the responses by defendants Rowe and Medina, "stop complaining I am

4

1    only following order from my sergeant and lieutenant," and "don't tell me talk to the sergeant this

2    is above my pay rate," are evidence of an agreement and meeting of the minds of the custody

3    defendants to intentionally cause plaintiff harm.  Id.  Similarly, he argues the references to "602"

4    to him by defendants McTaggart and Quiring, and all of the custody defendants laughing at him

5    and mocking him while leaving him in the holding cell for four hours each day, handcuffed

6    extremely tight behind his back, show their meeting of the minds to intentionally harm plaintiff.

7    Id. at 16.  Plaintiff contends their common objective was to harm plaintiff, and in furtherance of

8    the conspiracy, plaintiff contends the custody defendants fabricated the holding cell logs to show

9    plaintiff was provided restroom breaks.  Finally, plaintiff contends that defendants Chamberlin

10   and Arteaga joined the conspiracy when they refused to document plaintiff's injuries, and argues

11   that Arteaga's response, "No, No, No, I am not going to report anything," constitutes evidence of

12   an agreement and meeting among the minds to conspire to abuse plaintiff.  Id. at 16.  Plaintiff

13   argues that all the above actions were unlikely to have been undertaken without an agreement

14   among the defendants.  Id.

15   **III.    LEGAL STANDARDS FOR SUMMARY JUDGMENT**

16         Summary judgment is appropriate when it is demonstrated that the standard set forth in

17   Federal Rule of Civil Procedure 56 is met.  "The court shall grant summary judgment if the

18   movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

19   judgment as a matter of law."  Fed. R. Civ. P. 56(a).

20         Under summary judgment practice, the moving party always bears
           the initial responsibility of informing the district court of the basis
21         for its motion, and identifying those portions of "the pleadings,
           depositions, answers to interrogatories, and admissions on file,
22         together with the affidavits, if any," which it believes demonstrate
           the absence of a genuine issue of material fact.
23

24   Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P.

25   56(c).)  "Where the nonmoving party bears the burden of proof at trial, the moving party need

26   only prove that there is an absence of evidence to support the non-moving party's case."  Nursing

27   Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376,

28   387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 advisory

1    committee notes to 2010 amendments (recognizing that "a party who does not have the trial

2    burden of production may rely on a showing that a party who does have the trial burden cannot

3    produce admissible evidence to carry its burden as to the fact").  Indeed, summary judgment

4    should be entered, after adequate time for discovery and upon motion, against a party who fails to

5    make a showing sufficient to establish the existence of an element essential to that party's case,

6    and on which that party will bear the burden of proof at trial.  Celotex Corp., 477 U.S. at 322.

7    "[A] complete failure of proof concerning an essential element of the nonmoving party's case

8    necessarily renders all other facts immaterial."  Id. at 323.

9         Consequently, if the moving party meets its initial responsibility, the burden then shifts to

10   the opposing party to establish that a genuine issue as to any material fact actually exists.  See

11   Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

12   establish the existence of such a factual dispute, the opposing party may not rely upon the

13   allegations or denials of its pleadings, but is required to tender evidence of specific facts in the

14   form of affidavits, and/or admissible discovery material in support of its contention that such a

15   dispute exists.  See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party

16   must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

17   of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

18   (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

19   1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return

20   a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436

21   (9th Cir. 1987), overruled on other grounds as stated in Flood v. Miller, 35 F. App'x 701, 703 n.3

22   (9th Cir. 2002).

23        In the endeavor to establish the existence of a factual dispute, the opposing party need not

24   establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

25   dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

26   trial."  T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary judgment is to 'pierce

27   the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

28   Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's notes to 1963

6

1  amendments).

2        In resolving a summary judgment motion, the court examines the pleadings, depositions,

3  answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R.

4  Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson v. Liberty

5  Lobby, 477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed

6  before the court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.

7  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

8  produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

9  Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

10  1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

11  show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken

12  as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

13  'genuine issue for trial.'"  Matsushita, 475 U.S. at 586 (citation omitted).

14        By notice filed on March 1, 2024, plaintiff was advised of the requirements for opposing a

15  motion brought pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (ECF No. 66-3

16  (citing Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc)).).

17  **IV.    EIGHTH AMENDMENT EXCESSIVE FORCE CLAIMS**

18        Plaintiff contends that defendants Rowe and Medina applied handcuffs extremely tight,

19  and defendants Quiring, McTaggart, Rowe and Medina refused to loosen them while plaintiff was

20  held in a small holding cage for four hours each day.  SAC at 3, 5-6.

21        A.  Legal Standards

22        "In its prohibition of 'cruel and unusual punishments,' the Eighth Amendment places

23  restraints on prison officials, who may not . . . use excessive physical force against prisoners."

24  Farmer v. Brennan, 511 U.S. 825, 832 (1994).  "[W]henever prison officials stand accused of

25  using excessive physical force in violation of the [Eighth Amendment], the core judicial inquiry is

26  . . . whether force was applied in a good-faith effort to maintain or restore discipline, or

27  maliciously and sadistically to cause harm."  Hudson v. McMillian, 503 U.S. 1, 6-7 (1992).

28  When determining whether the force was excessive, the court looks to the "extent of injury

7

1  suffered by an inmate . . ., the need for application of force, the relationship between that need

2  and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and

3  'any efforts made to temper the severity of a forceful response.'"  Id. at 7 (quoting Whitley v.

4  Albers, 475 U.S. 312, 321 (1986)).  While de minimis uses of physical force generally do not

5  implicate the Eighth Amendment, significant injury need not be evident in the context of an

6  excessive force claim, because "[w]hen prison officials maliciously and sadistically use force to

7  cause harm, contemporary standards of decency always are violated."  Id. at 9.

8      B.  The Parties' Positions

9          1.  Defendants' Motion

10         Defendants contend that the unresisted application of handcuffs, which are authorized

11  restraint equipment, is not a use of force, nor was placing plaintiff in handcuffs for four hours an

12  excessive use of force because such placement was needed to ensure plaintiff's safety following

13  submission of his health care services request form claiming his intent to end his life.  Defs.'

14  Mem. at 8-9 (ECF No. 66-1); Defs.' Ex. C  (ECF No. 66-4 at 27).  Plaintiff did not have a chrono,

15  Developmental Disability Program ("DPP") Disability Accommodation, or other accommodation

16  under the Armstrong remedial plan, that prohibited or restricted plaintiff from being placed or

17  kept in handcuffs, from standing for an extended period of time, or from being placed in a holding

18  cell.  Defs.' Exs. G, H (ECF No. 66-4 at 84-87).  Defendants argue that keeping plaintiff

19  handcuffed during periods when he was not under direct supervision served a legitimate

20  penological goal to ensure plaintiff committed no self-harm.  Defs.' Mem. at 14.  Defendants

21  point out that plaintiff was immediately released as soon as his mental health clinician evaluated

22  plaintiff.  While plaintiff may have suffered some discomfort, defendants contend such

23  discomfort fails to rise to the level of cruel and unusual punishment.  Id.

24         2.  Plaintiff's Opposition

25         Initially, plaintiff notes that defendants declined to settle this case for $5,000.  Pl.'s Opp'n

26  at 1 (ECF No. 73).  Plaintiff argues that defendants did not follow policy because the handcuffs

27  were applied so tightly they caused plaintiff to suffer pain, bruises and swollen wrists, and that he

28  was not placed in a holding cell designated for suicidal inmates or those on a hunger strike.  Id. at

1    3.  Rather, he was placed in a holding cell intended for inmates who have assaulted staff or other

2    inmates or were resisting staff.  Id.  Plaintiff contends that he should have been escorted directly

3    to the triage and treatment area ("TTA") where he would receive direct observation and be

4    provided a mattress and a place to sit down, without being handcuffed behind his back.  Id. at 4,

5    citing MCSP's Operational Procedure Policy for Suicidal Prevention.  Further, plaintiff argues

6    that MCSP policy required that he be housed according to "MC 38, MHCB level of care and AH

7    [Alternative Housing] placements."  Id.  Plaintiff argues that nowhere in the policy does it

8    provide that plaintiff had to be handcuffed for the four hours he was held in the holding cell each

9    day.  Id. at 4-5.  Thus, plaintiff contends defendants failed to follow both suicide prevention and

10   hunger strike policies.  Plaintiff reiterates that custody defendants failed to loosen the handcuffs

11   despite plaintiff's complaints of pain.  Id. at 8-9.

12         Further, plaintiff submits medical records he claims rebuts defendants' contention that

13   plaintiff had no accommodation order precluding his handcuffing or being placed in a holding

14   cell, pointing to his left carpal tunnel syndrome which required he wear a permanent brace for

15   wrist support, was provided a lower bottom bunk, knee brace, ankle, foot orthoses (June 24,

16   2016), had back surgery in May 15, 2001, and suffered chronic pain to his lower back, left leg,

17   toe, and MRI showed disc bulge on both right and left sides (June 5, 2001).  Id. at 17-18 (citing

18   Pl.'s Ex. O (ECF No. 73 at 83-90).  As plaintiff set forth in his complaint, on both April 1 and 2,

19   2021, plaintiff informed custody defendants that he suffered from chronic pain to his wrist, knees

20   and back.  Id. at 18.

21            *3.  Defendants' Reply*

22         Initially, defendants object that settlement negotiations and communications are

23   confidential and plaintiff's continued reference to them is inappropriate and improper, and

24   nonetheless, plaintiff's current reference is inaccurate.  Defs.' Reply at 2-3 (ECF No. 76).

25   Defendants ask the Court to caution plaintiff about making any statements concerning

26   confidential settlement discussions.  Id. at 3.

27         As to plaintiff's excessive force claims, defendants first argue that even assuming

28   defendants failed to follow CDCR policies, which they do not concede, a failure to follow prison

9

1  policy does not establish § 1983 liability; rather, plaintiff must prove custody defendants violated

2  plaintiff's constitutional rights.  Defs.' Reply at 3 (citing Case v. Kitsap Cnty. Sheriff's Dep't,

3  249 F.3d 921, 930 (9th Cir. 2001)).[2]  Defendants also claim "[p]laintiff's allegations that

4  defendants failed to follow MCSP policy is irrelevant to the determination of whether defendants

5  violated his constitutional or federal civil rights."  Id.

6          Second, defendants point out that the MCSP policy quoted by plaintiff "clearly states that

7  direct escort to the TTA is only required if the inmate is actively self-injurious or otherwise not

8  safe to await a mental health evaluation in the program office."  Defs.' Reply at 4.  Defendants

9  agree with plaintiff that he was not resisting or engaging in self-injurious behavior, and therefore

10  contend it was safe for plaintiff to be housed in the program office while he awaited his mental

11  health evaluation, which aligned with MCSP policy.  Id.  Defendants argue that because plaintiff

12  was never deemed unsafe for his housing assignment, and because he had not yet been evaluated

13  by his mental health clinician, there was no need to implement the admission and treatment plans

14  per MHCB and AH policies and procedure.  Id.  Rather, as the above cited policy instructs,

15  "evaluations take place in the programming office unless it is unsafe to do so."  Id.

16          Third, contrary to plaintiff's contention that nothing in the policy required that suicidal

17  inmates be handcuffed while awaiting evaluation, defendants point to MCSP policy MC 011

18  which states "[a]n inmate expressing suicidal thoughts or ideation shall remain in restraints

19  (handcuffs)."  Id. at 5 (citing Ex. 1 ("MC 011") at 2) (ECF No. 76-1)).  Defendants argue that

20  being handcuffed in a holding cell for four hours, or even longer, is not a constitutional violation.

21  Id. (citing Defs.' Mem. at 16).  Defendants note that plaintiff never alleged he was held in the

22  holding cell for a continuous eight hour period, but rather was held in the holding cell for about

23  four hours on each of the two days.  Id.

24          Fourth, defendants contend that plaintiff improperly relies on policies regarding hunger

25  _____

26  [2]  In Case, the plaintiff conceded that the arrest was pursuant to a facially valid warrant, so the
    court evaluated whether defendant officers were entitled to qualified immunity.  Case, 249 F.3d at

27  926.  Such evaluation turned "on whether a reasonable officer would have known that the
    deputies' conduct violated Case's federal statutory or constitutional rights rather than merely a

28  state law or policy provision."  Id. at 929.

10

1    strikes in general, not hunger strikes being used to end one's life, which implicate policies for

2    suicidal inmates.  Id.  Defendants highlight the differences in procedures regarding inmate

3    placement and care for inmates on hunger strikes versus those managing suicidal threats and

4    attempts; the former focuses on maintaining institutional safety and discipline during hunger

5    strikes, whereas the latter focuses on individual inmate safety.  Id.

6        In conclusion, defendants contend that being handcuffed in a holding cell for four hours

7    on one day and four hours the next day is not a constitutional violation.  Id. at 6.  Defendants

8    assert that plaintiff was provided water and restroom breaks, but even if plaintiff's contrary

9    allegations are taken as true, a four hour deprivation is insufficient to demonstrate a constitutional

10   violation.  Moreover, defendants fully complied with MCSP policies in response to plaintiff's

11   claim he wanted to end his life, which demonstrates a lack of deliberate indifference.  But even if

12   plaintiff's contrary allegations were true, defendants contend that a violation of prison policy does

13   not amount to a federal or constitutional civil rights violation.  Id.

14       C.  Discussion

15           1. Settlement Negotiations and Communications are Confidential

16       The Court initially addresses defendants' request concerning settlement negotiations.

17   Defendants are correct that settlement negotiations and communications are confidential.  See

18   Cook v. Yellow Freight Sys., Inc., 132 F.R.D. 548, 554 (E.D. Cal. 1990), overruled on other

19   grounds by Jaffee v. Redmond, 518 U.S. 1 (1996); see also Goodyear Tire & Rubber Co. v.

20   Chiles Power Supply, Inc., 332 F.3d 976, 980 (6th Cir. 2003) (explaining "there exists a strong

21   public interest in favor of secrecy of matters discussed by parties during settlement

22   negotiations").  Plaintiff is admonished to refrain from referring to settlement negotiations and

23   communications in any future court filing.

24           2. Prison Policies and Regulations are Relevant, But Not Dispositive

25       As to the alleged Eighth Amendment excessive force claims, the Court agrees with

26   defendants that mere violations of prison policy or regulations, standing alone, do not rise to the

27   level of a constitutional violation.  See Nurre v. Whitehead, 580 F.3d 1087, 1092 (9th Cir. 2009)

28   (section 1983 claims must be premised on violation of federal constitutional right); Sweaney v.

11

1    *Ada Cnty., Idaho*, 119 F.3d 1385, 1391 (9th Cir. 1997) (section 1983 creates cause of action for

2    violation of federal law).  But the Court disagrees that whether defendants violated prison policy

3    or regulations is not relevant.  Because the evidence demonstrates plaintiff was escorted to the

4    holding cell because he expressed suicidal ideation, the policy governing such circumstances is

5    relevant here.  Further, alleged violations of such policy could be relevant and may provide

6    support for a prisoner's claim that his constitutional rights were violated, if the prisoner adduces

7    evidence his federal rights were violated.

8          In this case, the Court does not find that defendants violated MCSP policy.  As argued by

9    defendants, the general hunger strike policies are not relevant because plaintiff claimed he would

10    use a hunger strike to end his life.  Defs.' Ex. C at 27.  Because plaintiff's own written threat

11    implicated suicidal ideation, the Court finds that MCSP's policies governing suicidal inmates

12    governed the incidents at issue here, not the general hunger strike policies.  In his opposition,

13    plaintiff set forth the suicidal policy at issue, which defendants do not dispute:

14          Custody staff shall place the inmate under direct observation, per
           policy, via escort to the Yard Program Office.  The inmate shall be
15          placed in a holding cell for safety.  If the inmate is actively self-
           injurious or not otherwise safe to await a MH evaluation in the
16          program office, custody staff shall escort the inmate directly to
           Triage and Treatment Are" (TTA").
17

18    Pl.'s Opp'n at 3 (citing MCSP Operational Procedure, Suicide Prevention & Treatment of the

19    Suicidal Inmate/Patient, Managing Suicidal Threats) (ECF No. 73 at 34).  It is undisputed that

20    plaintiff was not resistive or exhibiting self-injurious behavior (*id.* at 3), and therefore the cited

21    policy provided that plaintiff should be placed in the holding cell in the program office because it

22    was safe for plaintiff to be put there.  The evidence demonstrates that custody defendants

23    followed MCSP policy for addressing suicidal inmates by placing plaintiff in the holding cell in

24    the program office for plaintiff's safety while he awaited mental health evaluation.  As to

25    plaintiff's argument that he should have been admitted or placed in areas outlined in MC 38 under

26    the suicide prevention policy's terms, such admission and placement only applies to prisoners

27    who are determined to be unsafe for their assigned housing.  Pl.'s Opp'n, Ex. A at 33.  Here, once

28    plaintiff was evaluated by his mental health clinician, it is undisputed that he was quickly cleared

1    and immediately released for return to his housing unit on both occasions.  Pl.'s Dep. I at 49:12-

2    15, 54:15-18, 63:4-11.  Similarly, plaintiff's claim that he should have been held under constant

3    observation fails because he had not yet been evaluated by his mental health clinician and was

4    never put on suicide watch under the suicide policy (Pl.'s Opp'n, Ex. A at 36).  Plaintiff adduced

5    no evidence showing it was unsafe for him to be held in the holding cell and admits he was not

6    resisting or engaging in self-injurious behavior during either incident.

7        In rebuttal to plaintiff's claim that MCSP policies do not require prisoners expressing

8    suicidal ideation to remain handcuffed (e.g., Pl.'s Opp'n at 4), defendants filed MCSP policy MC

9    011 that provides that if an inmate expresses suicidal ideation, the inmate "shall remain" in

10    handcuffs.  Defs.' Reply, Ex. 1 (ECF No. 76-1 at 5).  Based on this policy, and under these

11    circumstances, the Court agrees with defendants that restraining plaintiff in handcuffs while he

12    was in the holding cell complied with MCSP policy.  Id.

13        *3. Evaluation of Plaintiff's Excessive Force Claims Under the Eighth Amendment*

14        Because the defendants' adherence to prison policy is not dispositive of plaintiff's Eighth

15    Amendment excessive force claims, the Court now turns to evaluate whether the handcuffing by

16    custody defendants and their alleged refusal to loosen the cuffs constituted excessive force under

17    federal law.  "Not every malevolent touch by a prison guard gives rise to a federal cause of

18    action." Wilkins v. Gaddy, 559 U.S. 34, 37 (2010) (quoting Hudson, 503 U.S. at 9) (internal

19    quotation marks omitted).  In applying the Hudson factors set forth above, the relevant inquiry is

20    "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously

21    and sadistically to cause harm." Hughes v. Rodriguez, 31 F.4th 1211, 1221 (9th Cir. 2022)

22    (internal citation omitted).  While the absence of a serious injury is relevant to the Eighth

23    Amendment inquiry, it does not end it.  Hudson, 503 U.S. at 7.  The malicious and sadistic use of

24    force to cause harm always violates contemporary standards of decency.  Wilkins, 559 U.S. at 37

25    (quoting Hudson, 503 U.S. at 9) (quotation marks omitted).  Thus, it is the use of force rather than

26    the resulting injury which ultimately counts.  Wilkins, 559 U.S. at 38.

27        In cases where tight handcuffs were found to constitute unreasonable force, "factors in

28    addition to the tight handcuffing were shown including other forms of abusive conduct with the

13

1    handcuffing (such as physical violence), and/or plaintiff's visible pain or complaints of pain,

2    advice to the defendant of pre-existing injuries, and/or request(s) that the defendant remove or

3    loosen the handcuffs." Loftis v. Arisco, 2023 WL 5427943, at *2 (E.D. Cal. Aug. 23, 2023)

4    (quoting Taylor v. Cesarez, 2018 WL 6136154, at *6 (C.D. Cal. June 27, 2018)); see also Leon v.

5    Celaya, 2022 WL 1308123, at *9 (S.D. Cal. May 2, 2022), report and recommendation adopted,

6    2022 WL 3700560 (S.D. Cal. Aug. 8, 2022) ("In general, in cases where tight handcuffing was

7    found to constitute excessive force, the plaintiff was in visible pain, repeatedly asked the

8    defendant to remove or loosen the handcuffs, had pre-existing injuries known to the defendant, or

9    alleged other forms of abusive conduct by the defendant.").

10        Here, the evidence establishes that the use of handcuffs was required to protect plaintiff

11   from self-harm in light of his own written report that he intended to end his life.  It is undisputed

12   that at the time the handcuffs were applied, plaintiff was not resisting.  Thus, his placement in the

13   holding cells and the application of handcuffs was appropriate and does not constitute an

14   excessive use of force for the malicious and sadistic purpose of causing harm.  However, the issue

15   of overly tight handcuffs remains.

16        Defendants provided evidence that under these circumstances the application of handcuffs

17   was not a "use of force" according to prison policy.  Defs.' Mem. at 15, Ex. F at 81.  But

18   defendants provided no legal authority showing that once defendants are authorized under prison

19   policy to apply handcuffs, federal laws require no further legal evaluation (id. at 14), particularly

20   where the prisoner claims the handcuffs were intentionally applied "extremely tight," defendants

21   ignored plaintiff's requests to loosen them, he advised them of pre-existing injuries, and he was

22   held that way for four hours both days.  Since plaintiff was already restrained in a holding cell, an

23   inference can be raised that applying and retaining overly tight handcuffs was for the purpose of

24   causing pain, not simply to protect plaintiff from self-harm.

25        Defendants argue that even if they put the handcuffs on plaintiff in a manner that caused

26   plaintiff "discomfort," that does not constitute cruel and unusual punishment.  Id. at 14:15-17.

27   But again, defendants failed to address plaintiff's claim that the handcuffs were "extremely tight"

28   and caused him extreme pain, and that his requests for the handcuffs to be loosened were ignored.

The custody defendants provided no declarations as to their version of the April 2021 incidents. "Although the level at which tight handcuffing becomes unconstitutional is not well defined, the Ninth Circuit has found a triable issue when the handcuffs caused demonstrable injury or unnecessary pain, or when officers ignored or refused requests to loosen the handcuffs once alerted that the handcuffs were too tight." Brooks v. Ruiz, 2024 WL 2702916, *4 (C.D. Cal. Apr. 22, 2024) (holding plaintiff stated excessive force claim where plaintiff alleged he was tightly restrained for two hours causing numbness, discomfort, and prolonged pain and where "[defendant's] conduct in ignoring [p]laintiff's request to loosen the restraints . . . [did] not appear to be a good-faith effort to maintain or restore discipline but rather raise[d] an inference of malicious intent to cause [p]laintiff harm"); Palmer v. Sanderson, 9 F.3d 1433, 1436 (9th Cir. 1993) (in the context of an arrest, finding excessive force when officer refused to loosen tight handcuffs, which resulted in pain and bruises to plaintiff's wrists that lasted several weeks.); cf. Munywe v. Dier, 2022 WL 2161116, at *8 (W.D. Wash. Feb. 7, 2022),[3] report and recommendation adopted, 2022 WL 2157044 (W.D. Wash. June 15, 2022), aff'd, 2023 WL 3918254 (9th Cir. June 9, 2023).

Defendants did cite authority for the proposition that "[d]e minimis injury suggests a de minimis use of force." Defs.' Mem. at 14 (citing White by White v. Pierce Cnty., 797 F.2d 812, 816 (9th Cir. 1986) (additional citations omitted)). But the Supreme Court has rejected defendants' argument that a lack of significant injury confirms that the force used was not excessive. Wilkins, 559 U.S. at 37-38 ("Injury and force, however, are only imperfectly correlated, and it is the latter that ultimately counts.").

In light of defendants' failure to directly address plaintiff's overly tight handcuffing claim,

---

[3] In Munywe, the district court addressed a pretrial detainee's conditions of confinement claim under the Due Process Clause, and evidence included a video interview of Munywe's injuries following his release from the holding cell, in which Munywe claimed his "wrists were uncomfortable." 2022 WL 2161116 at 6-7. The district court found there was no objective evidence in the record that Munywe sustained cuts, bruises, or any other injury from the allegedly tight handcuffing. Id. at 6-8. "Even if the Court were to accept plaintiff's bare assertions that he was handcuffed behind his back in a holding cell for seven hours and denied water and bathroom use, these facts do not, absent more, support a reasonable finding that defendants expressly intended to punish plaintiff by exposing him to these conditions." Id. at 8.)

1    the Court finds that defendants failed to meet their burden on summary judgment, and the custody

2    defendants' motion on plaintiff's excessive force claim should be denied.

3        The Court also finds that there are genuine disputes of material fact that preclude granting

4    summary judgment as to plaintiff's claims that defendants Rowe and Medina applied the

5    handcuffs extremely tight at the orders of defendants McTaggart and Quiring, and that all the

6    custody defendants refused to loosen the handcuffs when plaintiff requested they do so on

7    multiple occasions during both days he was held in the holding cell.

8        Defendants adduced evidence that plaintiff did not have an accommodation chrono

9    showing he could not be handcuffed behind his back, or had to be handcuffed in the front, could

10   not stand for an extended period, or could not otherwise be held in a holding cell.  Defs.' Mem. at

11   14, Ex. G at 84.  Further, defendants argue that custody officers are not medical professionals and

12   are not responsible to interpret or reclassify accommodation chronos.  Defs.' Reply. at 9.

13   Defendants also provided holding cell logs that show plaintiff was checked on at regular intervals.

14   Defs.' Mem., Ex. E at 76-78.  The April 1, 2021 log reflects plaintiff was documented as "quiet"

15   on 8 different occasions.  Id., Ex. E at 76.  But none of the logs reflect plaintiff was asking to

16   have the handcuffs loosened.  Defs.' Mem., Ex. E at 76-78.  Defendants provided no declarations

17   from any custody defendant concerning the events of April 1 and 2, 2021.

18       On the other hand, plaintiff claims that he told both defendants McTaggart and Quiring

19   that the handcuffs were applied extremely tight causing severe pain and that he had back surgery

20   and suffered from chronic pain to his wrist, knees and back.  SAC at 5.  Plaintiff points to his

21   accommodation chrono for a wrist support brace, housing restrictions for a lower bunk, and

22   provided medical records documenting his back surgery, carpal tunnel syndrome, and other

23   ailments.  Defs.' Mem. at 14, Ex. G at 84; Pl.'s Opp'n, Ex. O at 82-90.  In response to plaintiff's

24   complaints, plaintiff claims that defendants laughed and mocked plaintiff and defendants

25   McTaggart and Quiring told plaintiff to file an appeal like plaintiff always does.  SAC at 5-6.  In

26   addition, plaintiff testified that in response to his pleas for help, the custody defendants ignored

27   his pleas and remained in the office "just laughing," while plaintiff was yelling, and claims the

28   proximity of the office to the holding cell was such that the custody defendants could hear

16

1   plaintiff yelling.  Pl's Dep. 62:2-13.  Despite his pleas for help, plaintiff contends defendants

2   McTaggart and Quiring failed to intervene and loosen the handcuffs.  SAC at 11-12.  As a result,

3   plaintiff suffered "bruises, swollen wrists, and pain to his back, shoulders, knees, neck and feet."

4   SAC at 6-7.

5          This Court finds that there are genuine disputes of material fact as to whether custody

6   defendants overly tightened plaintiff's handcuffs such that he sustained bruises and swollen

7   wrists, causing him extreme pain, raising an inference that the handcuffs were not applied in a

8   good faith effort to protect plaintiff from self-harm.  Accordingly, this Court finds that whether

9   defendants used excessive force in applying the handcuffs and in ignoring plaintiff's pleas to

10  loosen the handcuffs for a four hour period each day constitutes a disputed material fact.  Thus,

11  the custody defendants are not entitled to summary judgment on the Eighth Amendment

12  excessive force claim for overly tight handcuffing.

13  **V.     EIGHTH AMENDMENT CONDITIONS OF CONFINEMENT**

14         Plaintiff contends that being housed in a small cage for four hours on two separate days

15  without water or bathroom breaks, causing him to urinate on himself, constitutes a violation of his

16  Eighth Amendment right to humane conditions of confinement.[4]  SAC at 13.

17         A.  Legal Standards

18         In order for a prison official to be held liable for alleged unconstitutional conditions of

19  confinement, the prisoner must allege facts that satisfy a two-prong test.  Peralta v. Dillard, 744

20  F.3d 1076, 1082 (9th Cir. 2014) (en banc) (citing Farmer, 511 U.S. at 837).  The first prong is an

21  objective prong, which requires that the deprivation be "sufficiently serious."  Lemire v. Cal.

22  Dep't of Corr. & Rehab., 726 F.3d 1062, 1074 (9th Cir. 2013) (citing Farmer, 511 U.S. at 834).

23  In order to be sufficiently serious, the prison official's "act or omission must result in the denial

24  of the 'minimal civilized measure of life's necessities."  Lemire, 726 F.3d at 1074.  The objective

25  prong is not satisfied in cases where prison officials provide prisoners with "adequate shelter,

26

27  [4]  Although plaintiff's SAC claims he was held in the stand up cage for eight hours (id.), it is
    undisputed that plaintiff was held in the holding cell for no more than four hours on each day.

28  Pl.'s Dep. I at 48:14-16.

1   food, clothing, sanitation, medical care, and personal safety." <u>Johnson v. Lewis</u>, 217 F.3d 726,

2   731 (9th Cir. 2000) (quoting <u>Hoptowit v. Ray</u>, 682 F.2d 1237, 1246 (9th Cir. 1982)).  "[R]outine

3   discomfort inherent in the prison setting" does not rise to the level of a constitutional violation.

4   <u>Johnson v. Lewis</u>, 217 F.3d at 732 ("[m]ore modest deprivations can also form the objective basis

5   of a violation, but only if such deprivations are lengthy or ongoing").  Rather, extreme

6   deprivations are required to make out a conditions of confinement claim, and only those

7   deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to

8   form the basis of an Eighth Amendment violation.  <u>Farmer</u>, 511 U.S. at 834; <u>Hudson</u>, 503 U.S. at

9   9.  The circumstances, nature, and duration of the deprivations are critical in determining whether

10  the conditions complained of are grave enough to form the basis of a viable Eighth Amendment

11  claim.  <u>Johnson v. Lewis</u>, 217 F.3d at 731.

12         The second prong focuses on the subjective intent of the prison official.  <u>Peralta</u>, 744 F.3d

13  at 1082 (citing <u>Farmer</u>, 511 U.S. at 837).  The deliberate indifference standard requires a showing

14  that the prison official acted or failed to act despite the prison official's knowledge of a

15  substantial risk of serious harm to the prisoner.  <u>Id.</u> (citing <u>Farmer</u>, 511 U.S. at 842).  Mere

16  negligence on the part of the prison official is not sufficient to establish liability.  <u>Farmer</u>, 511

17  U.S. at 835.

18         B.  <u>Discussion</u>

19         Defendants provided holding cell logs that show plaintiff was offered water and given

20  restroom breaks on both days he was held in the holding cells.  Defs.' Ex. E (ECF No. 66-4 at 76-

21  78).  Further, the logs show that on April 1, 2021, plaintiff was in the holding cell three and a half

22  hours, and on April 2, 2021, he was in the holding cell for three hours.  <u>Id.</u>  Plaintiff denies he

23  was provided water or restroom breaks during either four hour period he was held in the holding

24  cells, and was forced to urinate on himself, and contends that the defendants fabricated the

25  holding cell logs.  Pl.'s Dep. I at 53:5-16.  Such disputes of fact, however, are not material under

26  these circumstances.  It is undisputed that plaintiff was placed in the holding cell because he

27  expressed an intent to die, and such suicidal ideation supported custody defendants putting

28  plaintiff in the holding cell in handcuffs while he awaited a mental health evaluation on both

1    days.  Indeed, plaintiff's placement in the holding cell was to ensure plaintiff was not at risk of

2    self-harm; thus, defendants did not deliberately ignore a substantial risk of harm by placing him

3    there.  The Ninth Circuit has found that prison officials must have the means to protect and

4    control suicidal and mentally ill inmates, and therefore the temporary placement of prisoners in

5    "safety cells," described by one expert witness as "small, dark, and scary," does not violate the

6    Eighth Amendment.  See Anderson v. Cnty. of Kern, 45 F.3d 1310, 1313-15 (9th Cir. 1995).

7    Thus, under the circumstances, the Court finds that custody defendants were not deliberately

8    indifferent to a substantial risk of harm by placing plaintiff in the holding cell, even for a four

9    hour period of time each day.

10        In addition, as argued by defendants, short term deprivations of water and sanitation that

11   do not pose a substantial risk of serious harm to the prisoner "do not give rise to deprivations that

12   are sufficiently serious to support an Eighth Amendment claim."  Gunn v. Tilton, 2011 WL

13   1121949, at *3 (E.D. Cal. Mar. 23, 2011) (collecting cases).  In Gunn, the district court found that

14   where the prisoner was not given water for about six hours, or restroom access for three to four

15   hours, such short term deprivations were temporary and posed no threat of serious physical harm

16   or illness and thus did not violate the Eighth Amendment.  Id. at 4; see also Minifield v.

17   Butikofer, 298 F. Supp. 2d 900, 904 (N.D. Cal. 2004) (five hour deprivation of water and

18   ventilation during cell extraction in prisoner's unit did not violate prisoner's Eighth Amendment

19   rights).  Similarly, plaintiff was not faced with a threat of serious physical harm or illness by

20   being placed in a holding cell for four hours, even without any water or restroom breaks.

21        To the extent plaintiff contends that being handcuffed for four hours was a violation of

22   humane conditions of confinement, such argument also fails.  See Pope v. Blauser, 2016 WL

23   6094508, at *5 (E.D. Cal. Oct. 19, 2016) ("being handcuffed for four hours and unable to access

24   the restroom during that period does not give rise to a deprivation sufficiently serious to support

25   an Eighth Amendment claim").  That plaintiff was forced to urinate on himself in the absence of

26   restroom access does not alter the analysis because the deprivation was temporary and posed no

27   threat of serious physical harm.  See, e.g., Pac. Marine Ctr., Inc. v. Silva, 809 F. Supp. 2d 1266,

28   1287 (E.D. Cal. 2011), aff'd, 553 F. App'x 671 (9th Cir. 2014) (during premises search, pretrial

1    detainee detained for four hour period, denied request to use the bathroom and "ultimately

2    urinated on herself," court found the duration of the detention was not prolonged, and officer's

3    refusal of her request to use restroom was not a constitutional violation); Curiel v. Stigler, 2008

4    WL 904894, at *5 (N.D. Ill. Mar. 31, 2008) (during prison cellhouse "shakedown," prisoner

5    handcuffed for "at most ten hours" without water and urinated on himself while handcuffed

6    outside, while "regrettable," found "wet pants for a couple of hours cannot be said to be an

7    objective violation of the Eighth Amendment.").

8        The Court acknowledges that the proper disposal of urine is a basic human need.  But

9    taking as true plaintiff's claims about the events of April 1 and 2, 2021, the nature, circumstances

10   and duration of the alleged deprivations fail to demonstrate that the conditions of plaintiff's

11   confinement in the holding cell were sufficiently serious or grave enough to rise to the level of an

12   Eighth Amendment violation.  The custody defendants are entitled to summary judgment on

13   plaintiff's Eighth Amendment conditions of confinement claims.

14   **VI.    FIRST AMENDMENT RETALIATION CLAIMS**

15       Plaintiff claims his prior grievances were the substantial or motivating factor behind the

16   custody defendants' conduct, and in support of his retaliation claim, cites defendants' statements

17   "602 to us like you always do," and "You heard 602 us," and claims the custody defendants

18   laughed and mocked plaintiff while he was asking them to loosen the handcuffs.  Pl.'s Opp'n. at

19   20.

20       A.  Legal Standards

21       "Prisoners have a First Amendment right to file grievances against prison officials and to

22   be free from retaliation for doing so."  Watison v. Carter, 668 F.3d 1108, 1114 (9th Cir. 2012)

23   (citing Brodheim v. Cry, 584 F.3d 1262, 1269 (9th Cir. 2009)).  To prevail on a retaliation claim

24   in the prison context, the prisoner must adduce evidence meeting five elements:  "(1) An assertion

25   that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's

26   protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment

27   rights, and (5) the action did not reasonably advance a legitimate correctional goal."  Rhodes v.

28   Robinson, 408 F.3d 559, 567-68 (9th Cir. 2005).

1    B. Discussion

2    Initially, the Court agrees with defendants that plaintiff's SAC fails to plausibly allege that

3    any named defendant took some adverse action against plaintiff because of his protected conduct,

4    that such adverse action chilled the exercise of plaintiff's First Amendment rights and failed to

5    advance a legitimate correctional goal. See SAC, passim. Indeed, plaintiff did not include a

6    separate retaliation cause of action. Id. Rather, as pointed out by defendants, plaintiff wrote,

7
8
9
> On information and belief [custody defendants] at all times relevant while employed by the CDCR ha[ve] a significant history of misconduct towards the inmate population that includes excessive force, falsifying reports . . . and retaliation against inmates who[] filed 602 grievances against.

10    SAC at 8. Importantly, plaintiff failed to mention that it was his own handwritten threat to end

11    his life that prompted his escort to the holding cell in the first place. Id., passim. Even assuming

12    that any defendant had a significant history of misconduct, which plaintiff did not demonstrate,

13    and this Court does not presume,[5] such alleged misconduct is not relevant to the instant claims

14    and is inadmissible character evidence. See Fed. R. Evid. 404. It is also significant that in his

15    deposition, plaintiff testified that he had not filed any grievance against any of the four custody

16    defendants. Pl.'s Dep. I at 69:11-13.

17    In his opposition, plaintiff cited three documents in support of his retaliation claims, but

18    none of these documents show a retaliatory motive by any defendant on April 1 or April 2, 2021.

19    First, plaintiff relies on grievance 55838, dated November 5, 2020, in which plaintiff alleged that

20    defendant McTaggart investigated and approved an allegedly false rules violation report written

21    by another officer, claiming a violation of his due process rights by McTaggart and other officers.

22
23
24
25
26
27
28
---
[5]  Plaintiff cites two examples to support his claim of "significant history of misconduct:"  (1) a lawsuit brought by a different inmate against multiple defendants, including J. Quiring, K. McTaggart and S. Medina, in Alley v. Saelee, No. 2:22-cv-0661 DAD CSK (E.D. Cal.).  (Pl.'s Opp'n at 103-22); and (2) a privilege log detailing a notice of adverse action against defendant Medina.  (Id. at 99-101).  Contrary to plaintiff's claim that the adverse action was imposed due to Medina's failure to report excessive force, the Court previously found that "the adverse action was based on Medina filing a tardy report concerning Medina witnessing two inmates fighting," and was not relevant to this action.  Aug. 10, 2023 Order (ECF No. 51 at 7).  As pointed out by defendants, nowhere in the privilege log or in the adverse action itself is the term "excessive force" used.  Pl.'s Opp'n at 100-01.  In any event, these examples do not constitute a "significant history of misconduct" by any defendant, including defendant Medina.

1   Pl.'s Opp'n, Ex. P at 92.  The grievance was disapproved.  Id. at 93.  Second, plaintiff cites

2   grievance 47214, dated October 7, 2020, in which plaintiff claimed Officer Marquina issued a

3   rules violation report falsely claiming plaintiff possessed alcohol.  Id. at 97.  In this grievance,

4   plaintiff refers to a three page statement, which plaintiff did not provide, and which plaintiff now

5   claims was a three page statement addressed to defendant J. Quiring.  Pl.'s Opp'n. at 18.  Third,

6   plaintiff refers to a March 1, 2021 letter to plaintiff from the Inspector General, which was

7   responding to plaintiff's letter to the Inspector General where he allegedly reported staff for

8   inciting violence against plaintiff by other inmates.  Id., citing Ex. P at 98.  Plaintiff also did not

9   provide his letter to the Inspector General.

10      A retaliatory motive may be shown by the timing of the allegedly retaliatory act or other

11  circumstantial evidence, as well as direct evidence.  Bruce v. Ylst, 351 F.3d 1283, 1288-89 (9th

12  Cir. 2003).  Circumstantial evidence may be shown by proximity in time between the protected

13  conduct and the alleged retaliation; expressed opposition to the plaintiff's conduct; or other

14  evidence that shows the defendant's reasons offered "for the adverse . . . action were false and

15  pretextual."  McCollum v. Ca. Dep't of Corr. And Rehab., 647 F.3d 870, 882 (9th Cir. 2011)

16  (internal quotation marks and citation omitted).  Mere speculation that a defendant acted out of

17  retaliation is not sufficient.  Wood v. Yordy, 753 F.3d 899, 904 (9th Cir. 2014) (affirming grant of

18  summary judgment because no evidence defendants knew about prisoner's prior lawsuit or that

19  defendants' alleged statements were made in reference to prior lawsuit).

20      The two grievances relied upon by plaintiff from October 2020 and November 2020 do not

21  bear any proximity in time to the April 1 and 2, 2021 incidents.  Further, the Court is not required

22  to review evidence not provided by the litigant.  But even so, as noted by defendants, the

23  purported statement sent to a supervising officer is not the same as filing a grievance against the

24  officer; because it was not a grievance against defendant Quiring, the Court would not consider it

25  protected conduct.  Finally, plaintiff provided no nexus between such written statement or his

26  missing letter to the Inspector General in which he allegedly reported "staff" for inciting violent

27  against plaintiff to the custody defendants or the incidents at issue here.  For all these reasons, the

28  Court is not persuaded that any of these three documents demonstrate a retaliatory motive on the

1    part of any of the custody defendants.

2    Plaintiff relies in large part on the two statements he declares were made by defendants

3    McTaggart and Quiring:  "602 us like you always do, and "602 us," respectively, and claims that

4    while he pled for help, the custody defendants "laughed at him and mocked him" while he was in

5    the holding cell both days.  SAC at 5-6, 15-16.  In his deposition, plaintiff testified the custody

6    defendants were in the adjacent office, "just laughing" while plaintiff was "yelling," but denied

7    any of the custody defendants taunted plaintiff while he was in the holding cell.  Pl.'s Dep. I 62:9-

8    16.  Id.  However, in light of the legitimate penological reason to protect plaintiff from harming

9    himself after he threatened to end his life, plaintiff was initially handcuffed and placed in the

10    holding cell pending evaluation by his mental health clinician, the Court finds it implausible that

11    retaliation was the substantial or motivating factor for the custody defendants' actions or

12    omissions.  See Capp v. Cnty. of San Diego, 940 F.3d 1046, 1055 (9th Cir. 2019) ("More

13    problematic to plaintiffs' [retaliation] claim is the Supreme Court's admonition that an allegation

14    is not plausible where there is an "obvious alternative explanation" for alleged misconduct.")

15    (citing Ashcroft v. Iqbal, 556 U.S. 662, 682 (2009) (quoting Bell Atl. Corp. v. Twombly, 550

16    U.S. 544, 567 (2007)).

17    Although plaintiff disputes what took place on April 1 and 2, 2021, such disputes are not

18    material because plaintiff cannot establish all retaliation elements.  For example, it is undisputed

19    that defendants' actions in placing plaintiff in the holding cells were for plaintiff's own protection

20    and safety in light of his written threat to end his life.  In addition, taking as true plaintiff's claims

21    that defendants Rowe and Medina applied the handcuffs extremely tight, that custody defendants

22    denied plaintiff water and restroom breaks, and defendants Chamberlin and Arteaga refused to

23    provide plaintiff medical care or document his injuries, plaintiff failed to adduce competent

24    evidence to show that such actions or omissions were because of plaintiff's conduct protected by

25    the First Amendment.  Finally, plaintiff failed to address the chilling effect, if any, he sustained as

26    a result of such acts or omissions.

27    Overall, even when viewing the record in the light most favorable to plaintiff, a reasonable

28    jury could not return a verdict for plaintiff on his retaliation claims because no defendant took

1    adverse action against plaintiff because of his protected conduct that chilled plaintiff's exercise of

2    his First Amendment rights.  Following submission of plaintiff's written threat to end his life, the

3    custody defendants handcuffed plaintiff and put him in the holding cells to protect him from self-

4    injurious acts.  Such actions were for a legitimate penological purpose under the circumstances.

5         In conclusion, the Court recommends that defendants' motion for summary judgment on

6    plaintiff's retaliation claims be granted.

7    **VII.    EIGHTH AMENDMENT MEDICAL CLAIMS**

8         Plaintiff alleges that on April 1 and 2, 2021, defendants Chamberlin and Arteaga failed to

9    provide medical care and failed to document his pain and injuries following his release from the

10   holding cells.  SAC at 6.  At all relevant times herein, both Chamberlin and Arteaga were

11   Psychiatric Technicians.  Pl.'s Opp'n at 26.

12        A.  Legal Standards

13        The Constitution requires prison officials to provide inmates with reasonably adequate

14   medical care.  See Estelle v. Gamble, 429 U.S. 97, 103 (1976).  To hold an official liable for

15   violating this duty under the Eighth Amendment, the inmate must satisfy two prongs, an objective

16   prong and subjective prong.  First, the inmate must suffer from a serious medical need (the

17   objective prong); and second, the official must be deliberately indifferent to the inmate's serious

18   medical need (the subjective prong).  See Snow v. McDaniel, 681 F.3d 978, 985 (9th Cir. 2012),

19   overruled in part on other grounds, Peralta, 744 F.3d at 1082-83; Wilhelm v. Rotman, 680 F.3d

20   1113, 1122 (9th Cir. 2012).  A medical need is "serious" if the failure to treat "could result in

21   further significant injury or the unnecessary and wanton infliction of pain."  Jett v. Penner, 439

22   F.3d 1091, 1096 (9th Cir. 2006) (internal citations omitted).

23        The "second prong—defendant's response to the need was deliberately indifferent—is

24   satisfied by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible

25   medical need and (b) harm caused by the indifference."  Id. (internal citations omitted).  This

26   standard requires that the prison official must not only "be aware of facts from which the

27   inference could be drawn that a substantial risk of serious harm exists," but that person "must also

28   draw the inference."  Farmer, 511 U.S. at 837.  This "subjective approach" focuses only "on what

24

1    a defendant's mental attitude actually was (or is), rather than what it should have been (or should

2    be)…"  Farmer, 511 U.S. at 839.  Deliberate indifference is a higher standard than medical

3    negligence or malpractice, and a difference of opinion between medical professionals—or

4    between a physician and the prisoner—generally does not amount to deliberate indifference.  See

5    Toguchi v. Chung, 391 F.3d 1051, 1060 (9th Cir. 2004); Jackson v. McIntosh, 90 F.3d 330, 332

6    (9th Cir. 1996), overruled in part on other grounds by Peralta, 744 F.3d at 1076.

7         Neither will an "inadvertent failure to provide medical care" sustain a claim.  See Estelle,

8    429 U.S. at 105.  Misdiagnosis alone is not a basis for a claim, see Wilhelm, 680 F.3d at 1123,

9    and a "mere delay" in treatment, "without more, is insufficient to state a claim of deliberate

10   medical indifference," Shapley v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th

11   Cir. 1985).  Instead, a prisoner must show that a delay "would cause significant harm and that

12   defendants should have known this to be the case."  Hallett v. Morgan, 296 F.3d 732, 746 (9th

13   Cir. 2002).

14       B.  Discussion

15       The Court finds that plaintiff failed to demonstrate he suffered an objectively serious

16   medical need at the time he presented to either defendant Chamberlin or Arteaga on April 1 or 2,

17   2021, respectively.[6]  Plaintiff claims he suffered "bruises, swollen wrists, and pain to his back,

18   shoulders, knees, neck and feet."  SAC at 6-7.  Viewing the evidence in the light most favorable

19   to plaintiff, such injuries resulted from plaintiff standing for four hours each day, and from being

20   tightly handcuffed with no water or restroom breaks (contrary to the holding cell logs which state

21   otherwise, and which plaintiff declares were fabricated).  But plaintiff provided no medical

22   evidence demonstrating that the injuries he sustained on April 1 or April 2, 2021, were

23   sufficiently serious to meet the objective prong.  See Jett, 439 F.3d at 1096.  In other words,

24   plaintiff adduced no medical evidence showing that the alleged failure to treat such injuries

25   "could result in further significant injury or the unnecessary and wanton infliction of pain."  Id.

26   _____

27   [6]  Defendants dispute that defendant Arteaga was the individual plaintiff spoke with on April 2,
     2021, but for purposes of this motion alone, stipulate that it was defendant Arteaga.  Defs.'
28   Separate Statement of Uncontroverted Facts at 8 n.3 (ECF No. 66-2).

1    Indeed, when asked what treatments he would have liked such defendants to provide, plaintiff

2    testified that if they had logged his injuries he "could have got treatment from [his] doctors."

3    Pl.'s Dep. II at 49:24.  But plaintiff failed to identify what treatment he required, and provided no

4    medical evidence to support his claimed need for treatment.  Pl.'s Opp'n, <u>passim</u>.  Rather,

5    plaintiff provided two medical records documenting plaintiff received medical assessments on

6    both April 1, 2021 and April 2, 2021, and both reflect "no actual or suspected pain" by nonparty

7    RN Roderick Omari.  Pl.'s Opp'n, Ex. M at 77-78.  On the dates of the incidents, the records

8    show plaintiff weighed in at 202 and 198 pounds, and his blood pressure readings were 134/96

9    and 135/87, respectively.  Plaintiff argues that these forms do not indicate that RN Omari asked

10    plaintiff what his injuries were.  Pl.'s Opp'n at 16.  But such argument does not rebut what the

11    records say, and his own declaration fails to address this issue.  Pl.'s Opp'n at 124-25.

12         Plaintiff also provided declarations from two inmates who witnessed plaintiff contacting

13    medical staff back at plaintiff's housing unit.  Pl.'s Opp'n, Exs. G, H at 60, 62.  Inmate Ayala

14    only identified "medical staff," not defendants Chamberlin or Arteaga.  <u>Id.</u>, Ex. G at 60.  Inmate

15    Booth declared he witnessed plaintiff ask both Chamberlin and Arteaga to give him medical

16    treatment and to document his injuries.  <u>Id.</u>, Ex. H at 62.  Booth also declared that plaintiff was

17    "very agitated pacing back and forward by the medication window."  <u>Id.</u>  But neither inmate

18    Ayala nor inmate Booth indicated they saw injuries other than swollen and bruised wrists and red

19    marks.  <u>Id.</u>, Exs. G, H at 60, 62.  Such observations comport with plaintiff's identified claims of

20    physical injuries sustained as a result of the tight handcuffing.  Based on this evidence, the Court

21    finds that plaintiff failed to demonstrate his injuries were objectively sufficiently serious to rise to

22    the level of an Eighth Amendment violation in the deliberate indifference medical context.  <u>See</u>

23    <u>Jett</u>, 439 F.3d at 1096.

24         But even assuming plaintiff's injuries were considered to be sufficiently serious to meet

25    the objective prong, plaintiff failed to adduce evidence that either defendant Chamberlin or

26    defendant Arteaga acted with a sufficiently culpable state of mind, failing to establish the

27    / / /

28    / / /

1    subjective prong of Jett.[7]  Plaintiff adduced no evidence demonstrating that either defendant

2    Chamberlin or defendant Arteaga were aware of facts from which they could draw an inference

3    that plaintiff was at a substantial risk of serious harm if they denied him medical care, or that

4    either of those two defendants drew such an inference.  Plaintiff does not allege that either

5    defendant tended to him while he was in the holding cell; indeed, these defendants staffed the

6    medical office back in plaintiff's housing unit.  See, e.g., Pl.'s Dep. II at 14:2-10, 15:3-9.

7    Plaintiff adduced no evidence demonstrating that either of these two defendants were aware how

8    long plaintiff had been held in the holding cell each day.  The Court notes that it is also

9    undisputed that when plaintiff was taken to "regular medical" following his release from the

10    holding cell, the medical staff weighed plaintiff and took his vitals, but then released him back to

11    his housing unit.  Pl.'s Dep. I at 64:13-17.  Thus, it appears that medical staff in "regular medical"

12    also did not subjectively believe plaintiff's medical needs required further medical care.  Plaintiff

13    relies on Owens v. Blagojevich, 2007 WL 61863, at *3-4 (S.D. Ill. Jan. 8, 2007), arguing that

14    where defendants knew of plaintiff's medical needs yet refused to report and document injuries or

15    provide medical care, there is a genuine issue of material fact precluding summary judgment.

16    Pl.'s Opp'n at 26-27.  However, Owens is distinguishable because in Owens, the plaintiff alleged

17    that during his hunger strike, he was left without medical care for 21 days and then later for 28

18    days.  Id. at *4.  Here, the evidence shows plaintiff had been on a hunger strike for two days:

19    April 1 and 2, 2021.  While plaintiff may not have received medical care from defendants

20    Chamberlin and Arteaga, it is undisputed that plaintiff was seen in "regular medical" where he

21    was weighed and had his vitals taken.  Pl.'s Dep. I at 64:13-17.  Plaintiff testified that he did not

22    tell "regular medical" staff about his injuries because there were three correctional officers there

23    and "those nurses are not going to go against the [correctional officers.]."  Pl.'s Dep. I at 65:14-

24    18.

25    _____

26    [7]  Plaintiff also contends that defendants Chamberlin and Arteaga have a significant history of
     misconduct that includes refusals to provide treatment and to document prisoners' illnesses and
27    injuries.  Pl.'s Opp'n at 14, Ex. J at 68-70.  However, the evidence refers to two grievances, only
     referring to defendant Chamberlin, and, even if true, do not constitute a "significant history of
28    misconduct," but in any event are inadmissible character evidence.

Viewing the record in the light most favorable to plaintiff, a reasonable jury could not return a verdict for plaintiff on this Eighth Amendment medical claim because he failed to adduce competent evidence that he presented with a sufficiently serious medical need that required medical care or that the failure to provide such medical care would result in further significant injury or chronic pain, and because he did not demonstrate that either defendant Chamberlin or defendant Arteaga was deliberately indifferent to plaintiff's serious medical needs.

For the above reasons, the Court recommends that defendants Chamberlin and Arteaga be granted summary judgment on plaintiff's Eighth Amendment medical claims.

C. Failure to Document Plaintiff's Injuries

Plaintiff brought a separate claim against defendants Chamberlin and Arteaga alleging deliberate indifference to plaintiff's serious medical needs alleging that these defendants failed to document the injuries he received as a result of the overly tight handcuffing.

However, as argued by defendants, plaintiff has no constitutional right to have his injuries documented. The Constitution requires prison officials to provide inmates with reasonably adequate medical care and treatment. See Estelle, 429 U.S. at 103. Plaintiff cites no legal authority for his theory that he has a constitutional right to have his injuries documented, and this Court found none. To the extent any defendant failed to document plaintiff's injuries, such failure would at most constitute a violation of prison regulations or policy. As discussed above, such violations do not demonstrate a federal civil rights violation. See Nurre, 580 F.3d at 1092 (section 1983 claims must be premised on violation of federal constitutional right). Thus, plaintiff's claim that defendants Chamberlin and Arteaga failed to document his physical injuries fails as a matter of law. See id.

Defendants Chamberlin and Arteaga are entitled to summary judgment on plaintiff's claim that his Eighth Amendment rights were violated by their alleged failure to document his injuries.

VIII. **CONSPIRACY CLAIMS**

Plaintiff claims that the custody defendants engaged in a conspiracy to maliciously and sadistically handcuff plaintiff and put him in a holding cell for four hours without water or restroom breaks, fabricated the holding cell logs, and defendants Chamberlin and Arteaga joined

1  the conspiracy when they refused to provide plaintiff medical care and to document his injuries.

2  SAC at 14-16.

3      A. Legal Standards

4      Conspiracy allegations must be more than mere conclusory statements.  Bonnette v. Dick,

5  2020 WL 3412733, at *4 (E.D. Cal. June 22, 2020) (citing Mosher v. Saalfeld, 589 F.2d 438, 441

6  (9th Cir. 1979)).  A conspiracy claim brought under section 1983 requires proof of an agreement

7  or meeting of the minds to violate constitutional rights.  Avalos v. Baca, 596 F.3d 583, 592 (9th

8  Cir. 2010); Mendocino Envtl. Ctr. v. Mendocino Cnty., 192 F.3d 1283, 1301 (9th Cir. 1999).  It

9  also requires proof of an actual deprivation of constitutional rights.  Hart v. Parks, 450 F.3d 1059,

10  1071 (9th Cir. 2006) (quoting Woodrum v. Woodward Cnty., Okla., 866 F.2d 1121, 1126 (9th

11  Cir. 1989)).  "To be liable, each participant in the conspiracy need not know the exact details of

12  the plan, but each participant must at least share the common objective of the conspiracy."

13  Franklin v. Fox, 312 F.3d 423, 441 (9th Cir. 2001) (internal quotation marks and citation

14  omitted), overruled in part on other grounds, Pearson v. Callahan, 555 U.S. 223, 236 (2009)

15      B. Discussion

16      As set forth above, it is undisputed that plaintiff was escorted to, and retained in the

17  holding cells, for a legitimate penological purpose—to protect plaintiff from self-harm after he

18  threatened to end his life until he could be evaluated by a mental health clinician.  Other than

19  reciting his conclusory version of the incidents, and the inferences he claims can be raised,

20  plaintiff adduced no competent evidence that defendants Chamberlin and Arteaga engaged in a

21  conspiracy with the custody defendants to intentionally refuse to document plaintiff's injuries or

22  provide him medical care following his release from the holding cells.  Indeed, in his deposition,

23  plaintiff testified their refusal to do so was based on a "code," that "medical don't get involved

24  with custody's issues."  Pl.'s Dep. II at 52:2-11.  Such speculation is insufficient to demonstrate a

25  meeting of the minds among defendants Chamberlin and Arteaga and the custody defendants.

26  Defendants Chamberlin and Arteaga are entitled to summary judgment on plaintiff's conspiracy

27  claims.

28      As to plaintiff's claim that the custody defendants engaged in a conspiracy to commit

harm by applying the handcuffs extremely tight to cause plaintiff pain while he was securely held in the holding cells, and then refused to loosen them despite his multiple requests and his advising them of his pre-existing physical injuries, there are genuine disputes of material fact that preclude granting summary judgment on such conspiracy claims.  Viewing the evidence in the light most favorable to plaintiff, a reasonable jury could find that while the custody defendants were in the office adjacent to the holding cell, ignoring plaintiff's pleas for help and laughing and mocking plaintiff, their failure to loosen the handcuffs while plaintiff was securely held in the holding cells constituted a conspiracy to harm or inflict pain on plaintiff.  See Gilbrook v. City of Westminster, 177 F.3d 839, 856 (9th Cir. 1999).  The custody defendants' knowledge of and participation in this conspiracy can be inferred from the circumstantial evidence, i.e., that they were involved in the overly tight application of handcuffs, and from the undisputed evidence that plaintiff requested the handcuffs be loosened on multiple occasions, notified the custody defendants of his pre-existing injuries, yet defendants ignored plaintiff's requests, remaining in the office while laughing and mocking plaintiff.  See id. at 856-57.  Thus, the custody defendants are not entitled to summary judgment on plaintiff's conspiracy claims in connection with the Eighth Amendment excessive force claim for overly tight handcuffing.

On the other hand, conspiracy is not itself a constitutional tort under 42 U.S.C. § 1983. Lacey v. Maricopa Cnty., 693 F.3d 896, 935 (9th Cir. 2012) (en banc).  Therefore, to the extent that plaintiff intended his conspiracy claims to encompass his other claims against the custody defendants, the Court found there was no genuine dispute of material fact as to whether plaintiff sustained constitutional violations as to these claims against the custody defendants:  (1) the Eighth Amendment excessive force claims against the custody defendants based on plaintiff's placement in the holding cells, (2) the Eighth Amendment conditions of confinement in the holding cells claims, and (3) the First Amendment retaliation claims.  Based on these three claims, plaintiff failed to demonstrate "any actual deprivation of his constitutional rights resulted from the alleged conspiracy."  Woodrum, 866 F.2d at 1126.  Thus, the custody defendants are entitled to summary judgment on plaintiff's conspiracy claims based on these three claims.

/ / /

1    **IX.    QUALIFIED IMMUNITY**

2        Defendants argue they are entitled to qualified immunity as to all of plaintiff's claims

3    because their conduct did not violate plaintiff's constitutional rights, and it was not clearly

4    established that a reasonable correctional officer or psychiatric technician would believe that such

5    conduct was unconstitutional.  Defs.' Mem. at 22-23.

6        A.  Legal Standards

7        "The doctrine of qualified immunity protects government officials 'from liability for civil

8    damages insofar as their conduct does not violate clearly established statutory or constitutional

9    rights of which a reasonable person would have known.'"  Pearson, 555 U.S. at 231 (quoting

10   Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  Qualified immunity shields an officer from

11   liability even if his or her action resulted from "'a mistake of law, a mistake of fact, or a mistake

12   based on mixed questions of law and fact.'"  Id. (quoting Groh v. Ramirez, 540 U.S. 551, 567

13   (2004)).

14       "Determining whether officials are owed qualified immunity involves two inquiries:

15   (1) whether, taken in the light most favorable to the party asserting the injury, the facts alleged

16   show the official's conduct violated a constitutional right; and (2) if so, whether the right was

17   clearly established in light of the specific context of the case."  Robinson v. York, 566 F.3d 817,

18   821 (9th Cir. 2009) (citing Saucier v. Katz, 533 U.S. 194, 201 (2001), receded from, Pearson, 555

19   U.S. at 236 (the two factors set out in Saucier need not be considered in sequence.)).  A right is

20   "clearly established" when, "at the time of the challenged conduct, the contours of a right are

21   sufficiently clear that every reasonable official would have understood that what he is doing

22   violates that right."  Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011) (quoting Anderson v.

23   Creighton, 483 U.S. 635, 640 (1987)).

24       The qualified immunity analysis is separate from the Eighth Amendment excessive force

25   analysis.  See Marquez v. Gutierrez, 322 F.3d 689, 691 (9th Cir. 2003).  Thus, a correctional

26   officer can do an act which would violate a prisoner's Eighth Amendment right but still be

27   entitled to qualified immunity if a reasonable officer in his position would have believed that his

28   response was a good faith effort to restore discipline.  Id. at 692-93; Estate of Ford v. Ramirez-

1   Palmer, 301 F.3d 1043, 1053 (9th Cir. 2002) (the existence of triable issues of fact as to whether

2   prison officials were deliberately indifferent does not necessarily preclude qualified immunity.).

3   Courts must be "hesitant 'to critique in hindsight decisions necessarily made in haste, under

4   pressure, and frequently without the luxury of a second chance.'" Marquez, 322 F.3d at 692

5   (quoting Whitley, 475 U.S. at 320).

6          B.   Discussion

7          Defendants move for qualified immunity on the grounds that their conduct did not violate

8   plaintiff's First and Eighth Amendment rights and because it would not have been clear to a

9   reasonable official in defendants' positions that their treatment of plaintiff violated clearly

10  established law.  However, as discussed above, defendants failed to address the issue of overly

11  tight handcuffs and their responses thereto.  "It is well settled that overly tight handcuffing can

12  constitute excessive force." Wall v. Cnty. of Orange, 364 F.3d 1107, 1112 (9th Cir. 2004).

13  Therefore, the Court finds that the custody defendants failed to establish they are entitled to

14  qualified immunity as to plaintiff's Eighth Amendment excessive force claim for overly tight

15  handcuffing, including his claim that the custody defendants conspired to handcuff plaintiff

16  extremely tight and refused to loosen the handcuffs to inflict pain or harm, where plaintiff was

17  securely held in the holding cells.  Taking as true plaintiff's allegations concerning the overly

18  tight handcuffing, as well as his declaration as to the custody defendants' responses, a reasonable

19  correctional officer would know that the failure to loosen overly tight handcuffs on a prisoner

20  securely held in a holding cell would be unconstitutional.

21         The Court found no genuine dispute of material fact remained to demonstrate a

22  constitutional violation for the following claims: (1) the Eighth Amendment excessive force

23  claims against the custody defendants based on plaintiff's placement in the holding cells; (2) the

24  Eighth Amendment claims challenging the conditions of confinement in the holding cells; (3) the

25  First Amendment retaliation claims; (4) the Eighth Amendment medical claims as to defendants

26  Chamberlin and Arteaga; and (5) the conspiracy claims based on claims (1) through (4) as to all

27  defendants.  Accordingly, as to these claims, "there is no necessity for further inquiries

28  concerning qualified immunity." Los Angeles Cnty. v. Rettele, 550 U.S. 609, 616 (2007)

1  (internal quotation marks and citation omitted).  Therefore, the Court declines to address the issue

2  of qualified immunity as to these five claims.

3  **X.      DEFENDANTS' MOTION TO STRIKE PLAINTIFF'S SUR-REPLY**

4          Following the filing of defendants' reply to plaintiff's summary judgment opposition, on

5  June 14, 2024 plaintiff filed a pleading titled "Notice of Motion and Plaintiff's Reply in Support

6  of Opposition Motion for Defendants Summary Judgment."  (ECF No. 77.)  On June 24, 2024,

7  defendants filed a motion to strike plaintiff's pleading filed June 14, 2024 as an impermissible

8  sur-reply.  (ECF No. 78.)  On July 3, 2024, plaintiff filed an opposition to defendants' motion to

9  strike.  (ECF No. 79.)  Defendants did not file a reply to the opposition.

10         The Local Rules provide for a motion, an opposition, and a reply.  See E.D. Cal. L.R.

11  230(l).  There is nothing in the Local Rules or the Federal Rules that provides the right to file a

12  sur-reply.  Though district courts have the discretion to either permit or preclude a sur-reply, see

13  JG v. Douglas Cnty. School Dist., 552 F.3d 786, 803 n.14 (9th Cir. 2008) (district court did not

14  abuse discretion in denying leave to file a sur-reply where it did not consider new evidence in

15  reply), the court generally views motions for leave to file a sur-reply with disfavor.  See Hill v.

16  England, 2005 WL 3031136, at *1 (E.D. Cal. Nov. 8, 2005) (citation omitted).

17         Plaintiff did not seek leave to file a sur-reply prior to filing the sur-reply.[8]  In addition, in

18  his opposition to the motion to strike, plaintiff failed to demonstrate good cause why he should be

19  granted leave to file a sur-reply.  Plaintiff primarily relies on his pro se status, and argues that his

20  pleadings should be construed liberally and held to less stringent standards.  (ECF No. 79 at 1.)

21  "Although the Court must construe the pleadings liberally, pro se litigants must follow the same

22  rules of procedure that govern other litigants."  Hernandez v. Nye Cnty. Sch. Dist., 2011 WL

23  2938274, at *1 (D. Nev. July 19, 2011) (internal quotation marks and citation omitted).  This

24  Court finds no good cause to permit plaintiff to file the sur-reply.  In addition, permitting plaintiff

25  to file the sur-reply would require granting defendants leave to respond to the sur-reply, further

26  delaying resolution of defendants' summary judgment motion.  For these reasons, defendants'

27  ──────────────────

28  [8]  Plaintiff's sur-reply consists of legal argument, citations to exhibits already filed and
   considered, and contains no new evidence.  (ECF No. 77.)

1  motion to strike plaintiff's sur-reply is granted.

2  **XI.  CONCLUSION**

3      In summary, as set forth above, the Court recommends that this action proceed solely as to

4  (1) plaintiff's Eighth Amendment excessive force claim for overly tight handcuffing against the

5  custody defendants McTaggart, Quiring, Rowe and Medina, and (2) plaintiff's related conspiracy

6  claim as to handcuffing against the custody defendants McTaggart, Quiring, Rowe and Medina.

7  The Court recommends granting summary judgment for defendants on all other claims.  As a

8  result, no claims remain against defendants Chamberlin and Arteaga.

9      Accordingly, IT IS HEREBY ORDERED that defendants' motion to strike plaintiff's

10  unauthorized surreply (ECF No. 78) is granted.

11      Further, IT IS RECOMMENDED that defendants' motion for summary judgment (ECF

12  No. 66) be granted in part and denied in part, as follows:

13      1.  Custody defendants McTaggart, Quiring, Rowe and Medina be granted summary

14  judgment on plaintiff's Eighth Amendment excessive force claims based on plaintiff's placement

15  in the holding cells on April 1 and 2, 2021; plaintiff's Eighth Amendment claims challenging the

16  conditions of confinement in the holding cells; and plaintiff's First Amendment retaliation claims;

17      2.  Defendants Chamberlin and Arteaga be granted summary judgment on plaintiff's

18  Eighth Amendment medical claims;

19      3.  All defendants be granted summary judgment on plaintiff's conspiracy claims based on

20  plaintiff's alleged constitutional violations as to his placement in the holding cells on April 1 and

21  2, 2021, the conditions of confinement in the holding cells, and retaliation (set forth in paragraphs

22  1 and 2 above); and

23      4.  Custody defendants McTaggart, Quiring, Rowe and Medina be denied summary

24  judgment on plaintiff's Eighth Amendment excessive force claim for overly tight handcuffing and

25  the related conspiracy claim as to handcuffing.

26      These findings and recommendations are submitted to the United States District Judge

27  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

28  after being served with these findings and recommendations, any party may file written

1  objections with the court and serve a copy on all parties.  Such a document should be captioned

2  "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

3  objections shall be filed and served within fourteen days after service of the objections.  The

4  parties are advised that failure to file objections within the specified time may waive the right to

5  appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

6

7  Dated:  February 18, 2025

8  _____

9  CHI SOO KIM
   UNITED STATES MAGISTRATE JUDGE

10  /1/cast2196.msj.csk

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28